IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

VICTORIA L. PEARSON,

                      Plaintiff,                      OPINION AND ORDER

    v.

                                                  24-cv-283-wmc

TREMPEALEAU COUNTY and
DEBRA A. SUCHLA,

                      Defendants.

      Plaintiff Victoria Pearson has filed this civil action under 42 U.S.C. § 1983, claiming that her employer, defendant Trempealeau County, and her supervisor, defendant Debra Suchla, unlawfully terminated her employment as Fiscal Manager for Trempealeau County Department of Human Services. Specifically, plaintiff clams: (1) she was fired in retaliation for reporting fraud to state and county officials in violation of the First Amendment; (2) defendants deprived her occupational liberty by making false, public statements about her fitness as an employee in violation of the Fourteenth Amendment Due Process Clause; and (3) she was fired for refusing to ignore state and federal "accounting laws" in violation of Wisconsin wrongful discharge law. Currently pending before the court is defendants' motion for summary judgment on all of plaintiff's claims on the merits, and alternatively with respect to the constitutional claims against Suchla, under the doctrine of qualified immunity.[1] (Dkt. #13.) While plaintiff concedes that she cannot present sufficient evidence to prove her due process

---

[1] Plaintiff does not allege the asserted basis for the county's liability in her complaint, nor discuss it in her brief in response to defendants' motion for summary judgment. However, the court assumes that she seeks to hold the county liable under *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978), based on Suchla's role as a policymaker with final decision-making authority over plaintiff's employment. *See Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009) (mayor was policy-maker with respect to personnel decisions under *Monell* theory of liability). Because the court finds no constitutional violation, however, the distinction is moot here.

claim, which she voluntarily dismisses, she opposes defendants' arguments concerning her remaining claims. For the reasons explained below, the court will now grant defendants' motion for summary judgment with respect to plaintiff's First Amendment claim and decline to exercise supplemental jurisdiction over her remaining state law claim.

## UNDISPUTED FACTS[2]

**A. Background**

Plaintiff Victoria Pearson is an adult resident of Whitehall, Wisconsin. Including her one-year probationary period, Pearson was employed on an at-will basis as Fiscal Manager for Trempealeau County's Department of Human Services ("DHS") from October 11, 2021, until January 5, 2023. As of August 2022, DHS included various units with separate supervisors. However, plaintiff worked under the direct supervision of defendant Debra Suchla, who served as Director of DHS until June 2023.

As Fiscal Manager, plaintiff oversaw all aspects of DHS's fiscal and support responsibilities, as stated in her position description:

> **Purpose of Position**
>
> . . . Perform and oversee fiscal/support responsibilities that include[e] financial accounting, process state claims, create and monitor department fiscal reports, billing, client file management, reception, contract management, audit, maximizing resources, budgeting and determine allowable costs.
>
> **Essential Duties and Responsibilities**
>
>                 \*   \*   \*
>
> Maintain agency accounting records that comply with County/State/Federal accounting requirements.

---

[2] Unless otherwise indicated, the following facts are drawn from the parties' proposed findings of fact and responses and are material and undisputed for purposes of summary judgment.

2

> Oversee accounts receivable, accounts payable, billing, client funds and payrolls.

*   *   *

(Dkt. #24-4, at 1.) As described below, in 2022, difficulties arose in plaintiff's relationship with Director Suchla and other members of DHS's "leadership team," leading to plaintiff's discipline and termination.

### B. Conflicts Arise

#### 1. Spring 2022 Fundraising Event

In the spring of 2022, Teah Waldera, then a social worker with DHS, organized a fundraising event through the county, which involved the sale of t-shirts with individuals to pay her directly. While she provides few details, plaintiff avers that she reported to Director Suchla her concerns about Waldera embezzling public money as part of the fundraiser, pointing to the fact that Waldera neither provided documentation for the number of shirts, nor produced a record of the total amount of money collected. (Dkt. #32, at ¶¶ 3-6.)

On March 7, 2022, Suchla allegedly notified plaintiff via text message that she "freaked out" upon learning Waldera was collecting the money directly. Nevertheless, Suchla avers that after she looked into the matter, she determined there was no evidence that Waldera inappropriately retained any funds belonging to the county. (Dkt. #19, at ¶ 7.) Suchla further avers that ultimately, there was a full accounting of the t-shirt sales by April 6, 2022, *and* that Waldera reimbursed the county for all sales. (*Id*., at ¶¶ 4 and 6).

In contrast, plaintiff disputes that a complete accounting and investigation occurred, testifying that: (1) Suchla had merely asked Waldera's supervisor (Julie White) about the matter; and (2) Waldera had not kept "proper" records of the t-shirt sales and expenses, which

3

Waldera ran through her personal bank and Venmo accounts. (Dkt. #25, at 50-57.)[3] In fact, according to plaintiff, Suchla brushed off plaintiff's concerns, telling her to drop the matter. Suchla also told plaintiff to stop using the term "embezzlement" to describe the Waldera situation.

### 2. Plaintiff Suspects Financial Mismanagement

Plaintiff next avers that her concerns about Suchla's financial management escalated during budgeting season for the 2023 fiscal year, which began in August 2022. Initially, plaintiff became concerned that Director Suchla's control over the budget process was setting plaintiff up to fail when an audit was performed. Worse, plaintiff came to the conclusion that Suchla herself was committing fraud against the state and county by misallocating grants, concealing the misallocations, and using those misallocated funds for her personal gain. More specifically, plaintiff avers that Suchla over-reported the county's needs for state grant money and double-allocated staff to generate a surplus, which she then concealed by using "non-lapsing accounts" that allowed funds to be carried into the next year.[4] Plaintiff further avers that Suchla improperly tied the receipt of surplus funds to future pet projects to enrich Suchla and others. (*See* dkt. #32, at ¶¶ 10-14.) For her part, Suchla denies any mismanagement or fraud.

---

[3] The cited page numbers refer to those from plaintiff's deposition transcript, filed at dkt. #25.

[4] Plaintiff defines non-lapsing accounts as funds from which money does not revert back into the county's general fund at the end of the fiscal year. (Dkt. #25, at 63.)

### 3. Plaintiff's Difficulties with Leadership Team

In several occasions in 2022, DHS unit supervisors Melissa Youngbauer and Julie White further complained to Suchla that plaintiff acted in an unprofessional manner by making unreasonable requests, belittling them, micromanaging their work, and repeatedly accusing Waldera of embezzling funds. Plaintiff denies this behavior and characterizes her relationship "positively" with respect to Youngbauer. Still, there is no dispute that Suchla and plaintiff discussed plaintiff's interactions with the leadership team during the summer of 2022. Indeed, plaintiff testified that she felt the entire leadership team was pulling away from her by the fall of 2022; in particular, plaintiff says the unit supervisors began repeating Suchla's comments criticizing plaintiff's efforts in monitoring DHS spending. (Dkt. #25, at 73-76.)

### 4. Plaintiff's Conversations with Suchla and Human Resources

On August 8, 2022, plaintiff also clarified a "numbers issue" that she was having with the proposed budget during a Human Services Board meeting, which related to a proposal to end the carry-out meal service for DHS's Aging and Disability Resource Center ("ADRC"). While the details are disputed, there is no dispute that Suchla took issue with plaintiff's comments to the board, subsequently leading to confrontational discussions between Suchla and plaintiff.

On August 31, 2022, plaintiff spoke over the telephone with the county's Human Resources Director, Christa Weisenberger. The parties dispute exactly what was discussed during that conversation, but they agree that plaintiff and Weisenberger looked at plaintiff's job description, which contemplates that the Fiscal Manager assist in the budget process. They further discussed plaintiff's concern that Suchla was going to fire her before the end of her probationary period in October 2022. In response, Weisenberger suggested that plaintiff reach

5

out to the county's Employee Assistance Program ("EAP"), which provided free professional coaching sessions, including how plaintiff could better communicate with a supervisor like Suchla.

On September 1, 2022, Suchla and plaintiff spoke further about the comments she had made at the public meeting of the Human Services Board. Because their September 1 meeting became confrontational, Suchla and plaintiff agreed to meet again on September 9, to continue the discussion. Later that same day, plaintiff called Weisenberger to discuss Director Suchla's apparent concern that plaintiff was after her job. When plaintiff met with Weisenberger in person the next day, September 2, plaintiff reported: (1) Suchla's plan was to have the entire leadership team leave the county at the same time; (2) remaining fearful that she was going to be fired before the end of her probationary period in October 2022, plaintiff was already looking for a new job; and (3) Suchla was intentionally making the budget confusing and adding "fluff," so that she could return as a paid contractor after her retirement to "save" the DHS budget.

In advance of her scheduled September 9 meeting with Suchla, plaintiff further called Kayla Huiras in Human Resources to discuss her concern that the Behavioral Health Unit's monthly bills were being paid without a supervisor's signature. Specifically, plaintiff explained to Huiras that she felt Suchla was asking her to do something unethical, which could get her fired before her probationary period expired on October 11, 2022.

There is some dispute about what Suchla and plaintiff actually discussed during their subsequent meeting on September 9. To begin, despite Suchla averring that she intended to use the September 9 meeting to provide plaintiff coaching and feedback about her performance, plaintiff avers that they primarily discussed her concern that a personal friend of

6

Suchla's, a DHS interpreter, was being paid for drive time contrary to the written contract for DHS interpreters. Plaintiff also reports again raising the issues surrounding Waldera's t-shirt sales. Regardless of the specific content of their discussion, the parties agree that the conversation escalated and became emotional, while disputing who caused the escalation. After the meeting ended, plaintiff went to see Huiras about the issues Suchla and she had discussed. After a two-hour meeting with Huiras, plaintiff remained visibly upset and asked to go home or take sick pay for the rest of the day.

### C. Plaintiff's Discipline and Termination

Between September 9 and 13, 2022, Suchla discussed her concerns with plaintiff's performance with Weisenberger and Huiras, including that plaintiff was micromanaging Suchla and other DHS unit supervisors, as well as insubordinate during both their September 1 and 9 meetings. Plaintiff denies having any performance issues and maintains that Suchla was retaliating against her for expressing legitimate financial concerns. During a job coaching session with Suchla, Huiras, and Weisenberger on September 22, 2022, plaintiff became argumentative and disagreed with the suggestion that she avoid spending a dollar to save a dime or spending hours to fix a problem that can be easily fixed. This time it was Weisenberger who recommended that they end the meeting and reconvene at a different time. Soon after, Weisenberger and Suchla agreed to discipline plaintiff for being insubordinate and disrespectful to Suchla, extend her probationary period, and contact the county's EAP provider for possible mediation. Plaintiff was then issued a verbal warning on September 28, regarding her alleged rudeness toward Suchla and Weisenberger on September

7

22. In a written rebuttal, plaintiff provided her own detailed explanation of Suchla's alleged fraud, misconduct, and retaliation.

The recommended EAP process began in October 2022. However, on October 17, Trempealeau County Corporation Counsel Rick Niemeier became the interim Human Resources Director as a result of Weisenberger's maternity leave, and plaintiff took FMLA leave and then sick leave from October 5 to November 18, 2022. Further, following an unsuccessful conflict mediation session between Suchla and plaintiff on December 9, 2022, Niemeier and Suchla agreed it was time to end plaintiff's employment.

Plaintiff was officially terminated on January 5, 2023, for the stated reason that she was insubordinate and unwilling to work collaboratively with Suchla. While Suchla resigned on June 21, 2023, DHS did retain Suchla's new employer, Express Personnel, in the summer and fall of 2023, to have her assist DHS with its 2024 budget.

**D. Plaintiff Reports Concerns to State Funder and County Auditors**

Finally, in December 2022, plaintiff shared information with a representative at Baker Tilly, the county's financial auditors, regarding Waldera's sale of t-shirts in the spring of 2022, as well as showed that representative grant documents to ensure that DHS was not over-allocating salaries in connection with state grants. In addition, during a financial meeting with Zachary Todd at the Wisconsin Department of Health Services in December 2022, plaintiff raised a concern that the county did not provide her adequate training and support; she may also have "alluded to the fact that without specifically saying [the lack of training was] causing

8

a violation" of some sort.[5] (Dkt. #25, at 216-17.) However, plaintiff concedes that she first raised her concerns regarding Suchla's accounting practices with Todd and County Board Chair Dick Miller on January 9, 2023, after she had already been terminated.

OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then to survive summary judgment the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In deciding whether to grant summary judgment, however, the court must view all facts and draw all inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

As discussed, plaintiff asserts that defendants violated the First Amendment by terminating her in retaliation for reporting fraud and wrongfully discharged her under state law for refusing to violate state and federal accounting rules. Defendants move for summary judgment on the grounds that undisputed facts establish: (1) plaintiff's speech was not protected under the First Amendment because she spoke as an employee, not as a private citizen, on a matter of public concern, nor was her speech a substantial or motivating factor in the county's decision to terminate her; and (2) plaintiff fails to demonstrate that she qualifies for the public policy exception to the employment-at-will doctrine under Wisconsin law.

---

[5] While neither party proposes any factual findings explaining the specific purpose of this meeting or Todd's role with respect to the Trempealeau County DHS, the Wisconsin Department of Health Services apparently provides grant funding to the counties.

Alternatively, defendants contend that Suchla is entitled to qualified immunity as to the First Amendment claim. As explained further below, the court concludes that plaintiffs' First Amendment claim fails both on the merits and on the grounds of qualified immunity, and in granting defendants summary judgment on plaintiff's remaining federal claim over which it has original jurisdiction, the court will decline to exercise supplemental jurisdiction over plaintiff's wrongful discharge claim arising under Wisconsin law.

## I. First Amendment Claim

A retaliation claim under the First Amendment has three basic elements: (1) the plaintiff engaged in protected speech; (2) the defendant took action that would dissuade the average person from speaking out similarly; *and* (3) the protected, First Amendment activity was at least a motivating factor in the defendant's decision to take the retaliatory action. *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020); *Harnishfeger v. United States*, 943 F.3d 1105, 1112-13 (7th Cir. 2019); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). Defendants challenge plaintiffs' ability to satisfy both the first and third elements, although even if plaintiff made this showing, defendants may still prevail by showing that they would have engaged the action anyway (its "but-for-cause" defense). *Id.*

Here, the parties agree plaintiff's First Amendment retaliation claim is based on four different expressions of her "financial concerns":

1) Plaintiff spoke about an unidentified "numbers issue" at a Human Services Board meeting on August 8, 2022.

2) Plaintiff spoke with Weisenberger in the county's human resources department about her concerns with Suchla on multiple occasions in 2022.

3) During a financial meeting with Todd at the Wisconsin Department of Health Services in December 2022, plaintiff raised a concern that the county did not provide adequate training and support and may have "alluded to the fact that

>   without specifically saying [the lack of training was] causing a violation." (Dkt. #25, at 216-17.)
>
>   4) In December 2022, plaintiff shared information with the county's financial auditors about Waldera's sale of t-shirts in the spring of 2022, including providing grant documents to ensure DHS was not over allocating salaries in connection with state grants.

(*See* dkt. #35, at ¶¶ 107-08, 110, 112-13, 115.)[6]

Determining whether any of plaintiff's speech is protected by the First Amendment is a question of law that involves multiple steps. *Harnishfeger*, 943 F.3d at 1113. Because plaintiff was a public employee, her First Amendment retaliation claim is subject to two, threshold inquiries and then a third balancing test: (1) whether plaintiff spoke as a private citizen or as part of her official duties, *Garcetti v. Ceballos*, 547 U.S. 410, 413 (2006); (2) whether plaintiff spoke on a matter of public concern, *Connick v. Myers*, 461 U.S. 138, 147-48 (1983); and (3) whether the county's interest in promoting effective and efficient public service outweigh plaintiff's interest in commenting on matters of public concern, *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968); *see also Friends of Blue Mound State Park v. Wisconsin Dep't of Nat. Res.*, 654 F. Supp. 3d 807, 819-20 (W.D. Wis. 2023) (citing *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 675-76, 678 (1996), addressing relevant inquiries for public employees' First Amendment retaliation claims). Defendants' challenges to plaintiffs' First Amendment claim address the first two inquiries, as well as whether Suchla is entitled to qualified immunity.

---

[6] While stating in her response to defendants' interrogatory no. 8 that she also reported her suspicions of fraud to Todd during the July fiscal manager regional meeting and to "Tammy" at the county clerk's office (dkt. #15, at 8-9), plaintiff fails to propose any factual findings or other evidence in support of that assertion in responding to defendants' motion for summary judgment.

When a defendant raises a qualified immunity defense, as Suchla does in this case, the plaintiff must show that the defendant violated clearly established law, which means that the law was sufficiently clear at the time of the alleged violation that every reasonable official would understand what he or she was doing is unconstitutional. *Tousis v. Billiot*, 84 F.4th 692, 698 (7th Cir. 2023). Plaintiff can prove this in one of three ways: (1) point to a closely analogous, binding case that established a right to be free from the type of action the defendant performed; (2) identify a clear trend in the case law showing that the recognition of the right by controlling precedent is merely a question of time; or (3) show that the defendant's conduct was "so egregious and unreasonable that no reasonable official could have thought he was acting lawfully." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 620-21 (7th Cir. 2022) (citations omitted).

While plaintiff may have raised some issues of public concern during her conversations with county and state officials and auditors, under clearly established law, her speech does not fall within the protection of the First Amendment because plaintiff certainly also spoke as part of her duties as Fiscal Manager and not merely as a private citizen.

### A. Content and Context of Plaintiff's Speech

Plaintiff asserts that: she became concerned with Suchla's financial management around April 2022; and by August 2022, she believed that Suchla was committing fraud by misallocating state grants, concealing misallocated funds in non-lapsing accounts, and using those funds for her personal gain. (*See* dkt. #29, at 2-3.) While plaintiff claims that she raised these concerns with the DHS Director Suchla, DHS's human resources department, a State of Wisconsin agency employee, *and* the county's auditors, she fails to clearly identify when, how,

12

and to whom these reports were made.[7]  Nonetheless, assuming a reasonable jury could credit her account as generally true, that same jury could infer at least some of her speech *may* have involved important public concerns.  *See City of San Diego, Cal. v. Roe*, 543 U.S. 77, 83-84 (2004) ("[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication."); *Garcetti*, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."); *Fehlman v. Mankowski*, 588 F. Supp. 3d 917, 922 (W.D. Wis. 2022), *aff'd*, 74 F.4th 872 (7th Cir. 2023) (citing *Garcetti* with regard to concerns interim police chief raised about his replacement's decisions jeopardizing officer safety and violating state law).

Still, a public employee like plaintiff must do more than show that she was speaking out on a matter of public concern; she must have spoken "as a citizen" rather than "pursuant to [her] official duties."  *Garcetti*, 547 U.S. at 421-22.  In determining whether an employee was speaking as a citizen or an employee, courts employ a "practical inquiry into what duties the employee is expected to perform."  *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008).  As a result, courts are not limited to the formal job description, the employee's core functions, or even speech that merely concerns those specific job duties.  *See id*.  Rather, the controlling factor is whether the speech "owes its existence to a public employee's professional responsibilities."  *Garcetti*, 547 U.S. at 421.

---

[7] Specifically, plaintiff failed to propose factual findings with citations to evidence in the record that support her accusations against Suchla with any specificity.  (*See* Summary Judgment Procedures, §§ I(A)(2), (B), and (C); *see also Allen-Noll v. Madison Area Tech. College*, 969 F.3d 343, 348 (7th Cir. 2020) (District courts may require "exact compliance with their local rules," including local rules governing summary judgment.).

Plaintiff contends that her speech to the county's human resources department, accountants, and state funding agency was "all outside [her] daily professional activities, and [] not within the general ambit of her job precisely because her supervisor was directing [her] to perform the County's accounting in such a way as to obscure the issues [she] had identified." (Dkt. #29, at 11.) However, there can be no dispute that plaintiff's role as Fiscal Manager included overseeing all DHS accounts, funds, billing, budgets, allowable costs, fiscal reports, and audits. *See Kubiak v. City*, 810 F.3d 476, 481 (7th Cir. 2016) ("We must make a practical inquiry into what Kubiak was expected to do as an employee."). Accordingly, she would be expected to raise any financial concerns, discrepancies, or potential violations she had with DHS administrators and auditors. *See Fehlman*, 588 F. Supp. 3d at 923 ("[T]he court of appeals has consistently held that an employee's complaints to or about supervisors regarding how the agency or department is run owes its existence to the employee's professional responsibilities, so it isn't citizen speech."). While plaintiff's statements to Todd with the Wisconsin Department of Human Resources may be a closer call, plaintiff did not discuss any financial irregularities with him until *after* she was terminated, and her vague statements about the county's lack of training do not rise to the level of a public concern.

For better or worse, "*Garcetti* and its progeny have significantly limited a public employee's protected speech in the workplace." *Fehlman*, 588 F. Supp. 3d at 922 (citing *Haka v. Lincoln Cty.*, 533 F. Supp. 2d 895, 918-19 (W.D. Wis. 2008) ("[T]he effect of *Garcetti* in this circuit has been devastating for public employees asserting claims for First Amendment retaliation.")). Indeed, "speech about many important issues can be left without constitutional protection," *id.*, including speech about public corruption, *e.g., Sigsworth v. City of Aurora, Ill.*, 487 F.3d 507, 510 (7th Cir. 2007) (police officer not speaking as citizen when he reported to

14

his supervisors his suspicions of misconduct by his colleagues); misuse of government funds, *e.g., Renken v. Gregory*, 541 F.3d 769, 774 (7th Cir. 2008) (state university professor was fulfilling his employment requirements when he complained within university system about university's use of grant funds); and harassment, *e.g., Kubiak*, 810 F.3d at 482 (police officer expected to report verbal assault by a colleague to supervisor, director, and internal affairs department as part of her job). Further, the Seventh Circuit has "repeatedly rejected … claims for a whistleblower carve-out from the category of unprotected employee speech." *Ulrey v. Reichhart*, 941 F.3d 255, 259 (7th Cir. 2019) (rejecting plaintiff's claim that reporting school superintendent's alleged misconduct and violations of school district policy on tobacco fell outside her official duties as assistant principal).

Thus, even though plaintiff maintains that she spoke out to expose fraud and other misconduct threatening the county, her speech is not protected by the First Amendment because she spoke as DHS's Fiscal Manager, rather than as a private citizen, and plaintiff has failed to meet her burden of proof with respect to a crucial element of her First Amendment retaliation claim. *See Harnishfeger*, 943 F.3d at 1113 (court need not engage in *Pickering* balancing if plaintiff cannot prevail on double threshold established by *Garcetti* and *Connick*). Equally telling, plaintiff has failed to point to law clearly establishing her speech as a private citizen, at least under the circumstances sufficiently close to that present in this case. Instead, if anything, *Garcetti* and its progeny, as interpreted by the Seventh Circuit, more strongly lead to a conclusion that public employees in similar situations do *not* fall within the ambit of First Amendment protections.

Having found that a reasonable jury would have to find Suchla did not violate plaintiff's First Amendment rights, or at least that Suchla is entitled to qualified immunity, the court also

necessarily holds that plaintiff's *Monell* claim against Trempealeau County must fail as a matter of law. *See Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020) (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404-07 (1997)) (claims under *Monell* must be supported by an underlying constitutional violation). Accordingly, defendants are entitled to summary judgment on plaintiff's First Amendment claims.

## II. State-Law Wrongful Discharge Claim

As for plaintiff's separate wrongful discharge claim against defendants under Wisconsin law, the court has supplemental jurisdiction over this claim under 28 U.S.C. § 1367(a), which permits a federal district court to hear a state-law claim if it is related to a federal claim in the same action. Plaintiff does not allege any other basis for federal jurisdiction over her state-law claim, including diversity jurisdiction, since she and defendants are all Wisconsin citizens. Absent unusual circumstances, when all federal claims have been dismissed before trial, as in this case, the general practice in federal court is to decline to exercise supplemental jurisdiction over the related state-law claims. *See Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019). Because neither party identifies any unusual circumstances that would justify retaining jurisdiction over plaintiff's state-law wrongful discharge claim, the court will decline to exercise subject matter jurisdiction without evaluating its merits.

Even so, plaintiff may still pursue her wrongful discharge claim in state court, subject to applicable statutes of limitations or any other procedural bars. While those limitations and bars periods may have been tolled during the period that this case has been pending, they will begin again 30 days from the date of this order. *See* 28 U.S.C. § 1367(d) ("The period of limitations for any claim asserted under [the court's supplemental jurisdiction] . . . shall be

tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."). Accordingly, plaintiff will need to proceed in state court sooner rather than later.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment as to plaintiff's federal claims under the First and Fourteenth Amendments (dkt. #13) is GRANTED.

2) Plaintiff's state-law wrongful discharge claim is DISMISSED without prejudice under 28 U.S.C. § 1367(c)(3).

3) The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 5th day of November, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge